# Exhibit A

**BOCHETTO & LENTZ, P.C.**
By:    George Bochetto, Esquire
       David P. Heim, Esquire
I.D. Nos. 27783, 84323
1524 Locust Street
Philadelphia, PA  19102
(215)735-3900
gbochetto@bochettoandlentz.com
dheim@bochettoandlentz.com



*Filed and Attested by the Office of Judicial Records 20 JAN 2023 12:55 pm C. PERRY*

*Attorneys for Plaintiff*s

| | |
|---|---|
| FRANK GIORDANO<br>and<br>DANIEL M. DiLELLA<br><br>*Plaintiffs*,<br><br>vs.<br><br>ANDREW HOHNS, NOAH GRIFFIN,<br>JAMES SWANSON, and JANE AND JOHN<br>DOES (1-10)<br><br>*Defendants*. | COURT OF COMMON PLEAS<br>PHILADELPHIA COUNTY<br><br>JANUARY TERM, 2023<br><br>NO. _____<br><br>JURY TRIAL DEMANDED |

## <u>NOTICE</u>

NOTICE

You have been sued in court.  If you wish to defend against the claims set forth in the following pages, you must take action within twenty (20) days after this complaint and notice are served, by entering a written appearance personally or by attorney and filing in writing with the court your defenses or objections to the claims set forth against you.  You are warned that if you fail to do so the case may proceed without you and a judgment may be entered against you by the court without further notice for any money claimed in the complaint or for any other claim or relief requested by the plaintiff.  You may lose money or property or other rights important to you.

YOU SHOULD TAKE THIS PAPER TO YOUR LAWYER AT ONCE.  IF YOU DO NOT HAVE A LAWYER OR CANNOT AFFORD ONE, GO TO OR TELEPHONE THE OFFICE SET FORTH BELOW TO FIND OUT WHERE YOU CAN GET LEGAL HELP.

Philadelphia Bar Association
Lawyer Referral and Information Service
One Reading Center
Philadelphia, PA 19107
Telephone: (215) 238 -1701

AVISO

Le han demandado a usted en la corte.  Si usted quiere defenderse de estas demandas expuestas en las paginas siguientes, usted tiene veinte (20) dias de plazo al partir de la fecha de la demanda y la notificacion.  Hace falta asentar una comparesencia escrita o en persona o con un abogado y entregar a la corte en forma escrita sus defensas o sus objeciones a las demandas en contra de su persona.  Sea avisado que si usted no se defiende, la corte tomara medidas y puede continuar la demanda en contra suya sin previo aviso o notificacion.  Ademas, la corte puede decidir a favor del demandante y requier que usted cumpla con todas las provisiones de esta demanda.  Usted puede perder dinero o sus propiedades u otros derechos importantes para usted.

LLEVE ESTA DEMANDA A UN ABOGADO INMEDIATAMENTE, SI NO TIENE ABOGADO O SI NO TIENE EL DINERO SUFICIENTE DE PAGAR TAL SERVICIO, VAYA EN PERSONA O LLAME POR TELEFONO A LA OFICINA CUYA DIRECCION SE ENCUENTRA ESCRITA ABAJO PARA AVERIGUAR DONDE SE PUEDE CONSEGUIR ASISTENCIA LEGAL.

Asociacion De Licenciados De Filadelfia
SERVICIO De Referencia E Informacion Legal
One Reading Center
Filadelfia, Pennsylvania 19107
Telefono: (215) 238-1701

**BOCHETTO & LENTZ, P.C.**
By:     George Bochetto, Esquire
        David P. Heim, Esquire
I.D. Nos. 27783, 84323
1524 Locust Street
Philadelphia, PA  19102
(215)735-3900
gbochetto@bochettoandlentz.com
dheim@bochettoandlentz.com                          *Attorneys for Plaintiff*s

| | |
|---|---|
| DANIEL M. DiLELLA<br>and<br>FRANK GIORDANO<br><br>                              *Plaintiffs*,<br><br>vs.<br><br>ANDREW HOHNS, NOAH GRIFFIN,<br>JAMES SWANSON, and JANE AND JOHN<br>DOES (1-10)<br><br>                              *Defendants*. | COURT OF COMMON PLEAS<br>PHILADELPHIA COUNTY<br><br>JANUARY TERM, 2023<br><br>NO. _____<br><br>JURY TRIAL DEMANDED |

## **COMPLAINT**

Plaintiffs, Daniel M. DiLella and Frank Giordano (sometimes collectively, "Plaintiffs"),

by and through undersigned counsel, Bochetto & Lentz, P.C., bring this action against

Defendants identified in the caption above, and in support thereof aver as follows:

## **INTRODUCTION**

1.      In the Summer of 2026, this Nation will celebrate a monumental, historic

moment:  the 250th anniversary of the Nation's Founders signing the Declaration of

Independence on July 4, 1776.

Case ID: 230102023

2.     In 2016, ten years in advance, Congress created the U.S. Semiquincentennial Commission ("Commission") to organize and coordinate the Nation's 250-year anniversary celebrations around the Country and the World.

3.     The express purpose of the Commission, according to the United States Semiquincentennial Commission Act of 2016, is "to provide for the observance and commemoration of the 250th anniversary of the founding of the United States through local, State, national and international activities planned, encouraged, developed and coordinated by a national commission representative of appropriate public and private authorities and organizations."

4.     The Commission is comprised of numerous appointed members, who include U.S. Senators, Members of the U.S. House of Representatives, U.S. Ambassadors, and several distinguished private citizens from various parts of the Country with diverse backgrounds in academia, the arts, and business.

5.     This case concerns a malicious effort by the Defendants to wrest leadership of the Commission from Plaintiffs, Daniel M. DiLella, who was appointed the Chairperson of the Commission by Former President Trump and then reappointed by President Biden, and Frank Giordano, who was hired as the Executive Director of the Commission.

6.     The Defendants herein are three citizen-members of the Commission.

7.     Defendants, motivated by their personal, ego-driven agendas for the Semiquincentennial, have engaged in a campaign of libel, slander, and smearing against Plaintiffs accusing Plaintiffs of mismanaging the Commission, wasting public funds, engaging in cronyism, violating the Commission's internal rules and by-laws, and breaching their fiduciary duties.

2

Case ID: 230102023

8.      Defendants intentionally made these false and defamatory accusations to fellow Commission members, high ranking government officials, and to regional and national publications such as *The Wall Street Journal, The Washington Post*, and *Philadelphia Magazine,* all of which published Defendants' false and defamatory statements to a national and worldwide audience.

9.      Ultimately, Defendants' defamatory campaign was successful; after the media published Defendants' false and defamatory statements, the White House decided to replace DiLella as Chairperson, and Giordano has been asked to step down as Executive Director once a replacement for the role is hired.

10.     Plaintiffs are filing this case to set the record straight – they committed none of the nefarious acts of which Defendants falsely accused them – and to hold Defendants accountable for their outrageously false statements which have caused Plaintiffs enormous harm to their personal and professional reputations.

## **PARTIES**

11.     Plaintiff, Daniel M. DiLella ("DiLella"), is an adult individual with residences in Florida and in Pennsylvania.  DiLella can be served c/o Bochetto & Lentz, P.C., 1524 Locust Street, Philadelphia, Pennsylvania 19102.

12.     Plaintiff, Frank Giordano ("Giordano"), is an adult individual residing in Moorestown, New Jersey.  Giordano can be served c/o Bochetto & Lentz, P.C., 1524 Locust Street, Philadelphia, PA 19102.

13.     Defendant, Andrew Hohns ("Hohns"), is an adult individual residing in Philadelphia County at 400 Locust Street, Philadelphia, PA 19107.

14.     Defendant, Noah Griffin ("Griffin"), is an adult individual residing at 10 Circle Drive, Apartment C, Bel Tiburon, CA 94920-2127.

3

Case ID: 230102023

15.     Defendant, James Swanson ("Swanson"), is an adult individual residing at 8512 Academy Road, Richmond, VA 23229-6404.

## JURISDICTION AND VENUE

16.      This Court has specific personal jurisdiction over Defendants because each of them had specific contacts with Pennsylvania related to the claims set forth herein, including their participation in the U.S. Semiquincentennial Commission and the America250 Foundation, and they directed their tortious and defamatory activity at Plaintiffs herein with the intent of harming both Plaintiffs in Pennsylvania.

17.     Further, this Court has general personal jurisdiction over Defendant Hohns because he resides in Philadelphia, Pennsylvania and owns real property in Pennsylvania.

18.     Venue is proper in Philadelphia because most of the Defendants' conduct giving rise to these claims occurred in Philadelphia County, publications of the defamatory statements occurred in Philadelphia County, and the defamatory publications were read and understood by Plaintiffs' friends, neighbors, family members and business associates in Philadelphia County.

## FACTS COMMON TO ALL COUNTS

19.      Plaintiffs have each achieved high levels of success in their professional careers and as leaders for diverse philanthropic efforts.  Prior to the tortious campaign waged by Defendants, Plaintiffs enjoyed superb reputations for their charitable work and as business leaders.

20.     DiLella has been a stalwart of the real estate investment community for over four decades.  He currently is the President and CEO of Equus Capital Partners, Ltd., a national real estate investment management company with many billions of dollars under management, including investments from the nation's most prominent public, corporate and union pension plans, university endowments, and foundations.

4

Case ID: 230102023

21.     Before being appointed by the President of the United States as Chairperson of the Semiquincentennial Commission in 2016, DiLella served on numerous charitable and education executive boards, including serving as Trustee of the Cahill Trust, Board member for the Museum of the American Revolution, President of the Union League of Philadelphia, Board of Trustees of Villanova University, Chair of the Trustee's Committee of Villanova University, and Chair of the Board of Roman Catholic High School, among others.

22.     Likewise, Giordano is well-known for being a long-time advocate for charitable causes involving the public interest, particularly charities promoting the arts.

23.     Giordano has been honored by appointments on the governing boards of numerous philanthropic organizations and committees, including as an appointee by the White House to the President's Advisory Committee on the Arts, serving on the Board of Trustees for the Coriell Institute for Medical Research, Rowan University, the Philadelphia Youth Orchestra-Institute, and as a past President of the Union League of Philadelphia.

24.     Giordano has also operated a very successful, family-owned logistics and transportation business established some 70 years ago, and he is a respected member of the business community.

25.     Because of their long and distinguished careers serving on charitable boards and committees, DiLella and Giordano were ideal choices for leadership positions on the Commission, and they considered their leadership roles as a once in a lifetime honor, where they each could use their vast experiences as business and philanthropic leaders to help provide a platform for celebrating the 250th Anniversary of the World's first modern Democracy.

Case ID: 230102023

26.     Thus, when they received their appointments, DiLella and Giordano immediately committed substantial amounts of their time, energy, and resources toward achieving the Commission's goals, all before any funding was appropriated by Congress.

27.     DiLella and Giordano began organizing and setting agendas for the Commission, hiring consultants and staff, finding office space, and spending hundreds of thousands of dollars from personal funds on start-up costs for the Commission.

28.     In the early stages of the Commission, DiLella and Giordano also relied heavily on their professional networks to obtain much needed services from people and companies that would work *pro bono* (*i.e.*, without compensation) before funds were appropriated.

29.     Unfortunately, not all members of the Commission shared DiLella's and Giordano's altruistic views about membership on the Commission – some saw membership on the Commission as a vehicle to push personal and opportunistic agendas.

30.     One such member of the Commission is Andrew Hohns, the CEO of a Philadelphia investment firm, who has promoted the Semiquincentennial as an opportunity for the Philadelphia area to attract a "giant wave of investment" in private development and public infrastructure, bringing many billions of dollars to the City and region.

31.     Hohns has been obsessed with the Semiquincentennial since at least 2012 when he helped form "USA250," a nonprofit company which he self-appointed as the fundraising and planning arm for the national Semiquincentennial commemorative events.

32.     Hohns claimed his nonprofit company, which he helped form 15 years in advance of the planned celebrations, procured millions of dollars in provisional commitments from large corporate partners for the 2026 celebrations.

Case ID: 230102023

33.     Hohns also claimed he heavily lobbied Congress to pass the Act which created the Commission in 2016.

34.     Following the establishment of the Commission, Hohns submitted a bid in response to a request for public bids by the Department of Interior/National Park Service for his nonprofit entity – USA250 – to act as the "Administrative Secretariat" of the Commission, which is the private nonprofit partner of the Commission that would engage in fundraising, sponsorship, and planning efforts.

35.     Hohns heavily lobbied other members of the Commission, the White House, and other elected officials for USA250's bid to be accepted, during which he touted his organization as the undisputed leader in Semiquincentennial planning and as best positioned to serve the Commission as the Administrative Secretariat.

36.     Hohns' public bid and numerous lobbying efforts for USA250 to win the Administrative Secretariat position were ultimately unsuccessful.

37.     Instead, another nonprofit, the American Battlefield Trust ("Battlefield Trust"), which also submitted a bid, was selected as the Commission's Administrative Secretariat by the United States Department of Interior.

38.     Ultimately, the Battlefield Trust, in consultation with the Department of Interior and the National Park Service, agreed to create a separate nonprofit organization to perform the Secretariat's roles and activities for the Semiquincentennial, which led to the creation of the America250 Foundation.

39.     Hohns' entity, USA250, has no official role with the Commission, the Battlefield Trust or America250 Foundation.

Case ID: 230102023

40.     In fact, Hohns himself no longer has a role with USA250, which was renamed Philadelphia250.

41.     Due to Hohns' hyperbolic conduct during USA250 board meetings, his fellow board members requested he resign from his board seat with the organization.

42.     Further, while Hohns was appointed a member of the Commission, he was not selected for a leadership role with either the Commission or America250 Foundation.

43.     Rather, DiLella and Giordano had the key leadership positions with the Commission and America250 Foundation which Hohns has long coveted.

44.     After publicly touting himself and his nonprofit as *the* leaders in the Semiquincentennial planning for over a decade, and after unsuccessfully seeking public approval of his ideas of having the celebrations take place in Philadelphia (as opposed to celebration events across diverse parts of the Country), Hohns was no longer at the forefront of the planning process.

45.     Hohns and his Philadelphia-centric ideas for the Semiquincentennial were uniformly rejected on many different levels – by the Commission, by the White House, and by various federal and state elected officials, all of whom decided against adopting Hohns' proposals to plan a Philadelphia-centric event.

46.     In the process of and ultimately as a result of the forgoing, Hohns developed an unmistakable animus against both DiLella and Giordano, born out of his jealousy of their leadership roles with the Commission and Hohns' megalomanic beliefs that his vision of the Semiquincentennial was the only way the event should be planned.

Case ID: 230102023

47.     Hohns' personal animus materialized even before the initial Commission meeting when he participated in penning a letter which called into question DiLella's and Giordano's conduct as leaders of the Commission.

48.     Upon information and belief, Swanson and Griffin also participated in writing the letter.

49.     That letter was on Congressman Bob Brady's letterhead and was dated October 19, 2018.

50.     The letter, addressed to DiLella and copied to the Commission members, was sent a month before the first Commission meeting, which was scheduled to take place on November 16, 2018, in Philadelphia, at Independence Hall.

51.     The October 19, 2018 Letter on Congressman Brady's letterhead ("Brady Letter") is attached hereto as Exhibit "A."

52.     The letter primarily focused on DiLella hiring Giordano to serve as the Executive Director of the Commission, implying that DiLella, as the Chairperson of the Commission, had engaged in some form of impropriety or conflict of interest by appointing Giordano without conducting a "nationwide search" to fill the Executive Director position.

53.     In reality, DiLella was well within his statutory authority to hire the executive director and other employees of the Commission in the manner that he did.

54.     There was no language in the enabling legislation of the Commission requiring a national search, and there were no restrictions on the Chairperson's discretion in hiring an executive director.

55.     The enabling legislation – the U.S. Semiquincentennial Commission Act – specifically gave the Chairperson authority to appoint an executive director, and further, the Act

Case ID: 230102023

exempted that hiring process from "civil service laws" that would ordinarily impose restrictions or selection requirements for the hiring process:

> "The Chairperson of the Commission may, without regard to the civil service laws (including regulations) appoint and terminate an executive director and such other additional personnel as are necessary to enable the Commission to perform the duties of the Commission."

P.L. 116-828 Sec. 8(c)(1).

56.    At or about the time the Brady Letter was sent, Swanson personally contacted DiLella in advance of the first Commission meeting, urging DiLella and Giordano to resign to avoid further inquiry into the issues raised by the Letter.

57.    DiLella and Giordano respectfully declined since they knew there was nothing wrong at all with their conduct.

58.    During the first Commission meeting in Philadelphia on November 16, 2018, Hohns again raised the false statements in the Brady Letter, expressly accusing DiLella of improprieties in connection with hiring Giordano as the Executive Director.

59.    After the first Commission meeting, Plaintiffs were shocked to learn that the October 19, 2018 Brady Letter was not actually written by Congressman Brady.

60.    Congressman Brady informed Plaintiffs that he had no role with writing the Letter, that Hohns apparently wrote or contributed to the creation of the Letter and somehow had the Letter forwarded on the Congressman's letterhead, and that the Congressman had neither read the Letter nor knew about the Letter before it was sent.

61.    Thereafter, when Congressman Brady learned of the Letter, he sent a letter to DiLella explaining that he never doubted or lacked confidence in Giordano's ability to serve the Commission as Executive Director, and he urged that Giordano be hired as the permanent

Case ID: 230102023

Executive Director.  A copy of Congressman Brady's December 1, 2018 letter to DiLella is attached as Exhibit "B."

62.     Thereafter, the Commission voted to confirm Giordano as the Executive Director of the Commission as required by Section 8(c)(2) of the U.S. Semiquincentennial Commission Act.  Congressman Brady, who was also a member, voted in favor of hiring Giordano.

63.     Aside from his attempts to interfere with DiLella's and Giordano's leadership roles at the initial Commission meeting and the "unauthentic" Brady Letter, Hohns also solicited the support of fellow Commission members James Swanson and Noah Griffin to further undermine DiLella and Giordano.

64.     Together, Hohns, Swanson and Griffin repeatedly conspired to undermine, second guess and defame DiLella and Giordano during Commission meetings and in private.

65.     In this regard, Hohns, Swanson and Griffin effectively hijacked a September 2021 Commission meeting by interrupting DiLella so that they could each read from prepared speeches, during which they maliciously disparaged DiLella and Giordano by falsely accusing them of mismanaging the Commission and Foundation, wasting public funds, violating governing rules, and cronyism.

66.     Worse, Hohns, Swanson, and/or Griffin, as part of their plan to disparage and ultimately force DiLella and Giordano out of leadership, tipped off a reporter from the *Wall Street Journal* about their intentions to read their defamatory, scripted speeches during the September 2021 meetings, so that the reporter would be present during the meeting and their statements would be covered by the media and eventually rebroadcasted.

Case ID: 230102023

67.     During their speeches before the Commission, Defendants also demanded an independent audit into the finances of the Commission and the Foundation and called for a Congressional investigation.

68.     Hohns, Griffin and Swanson also contacted influential elected officials within Congress – including then Speaker of the House Nancy Pelosi – making the same or similar false and defamatory claims that DiLella and Giordano were violating their fiduciary duties by mismanaging the Commission and Foundation and wasting public funds.

69.     When Defendants' antics and false claims gained no traction with the fellow Commission members and elected officials, the trio went back to the media to make the same false and defamatory claims of mismanagement against DiLella and Giordano.

70.     In this regard, starting in about March 2022 through June 2022, a series of strategically placed articles were published in the *Wall Street Journal,* the *Washington Post* and *Philadelphia Magazine*, in which Hohns and Griffin were quoted making highly critical and defamatory statements about DiLella and Giordano, including, but not limited to the following:

- "'We've suffered through four years of these antics with no vision at all for 2026,' said Commissioner Andrew Hohns, chief executive of Philadelphia investment firm Newmarket Capital. "'There has been little to no focus on the hard work of historic preservation, capital and community investment, and planning for the celebration or building its legacy.'" [*Wall Street Journal*, March 19, 2022]

- "'I'm not at all comfortable with the way things stand,' Hohns said. 'This is a very significant abuse of this public institution.'" [*Washington Post*, April 22, 2022]

- "Commissioner Noah Griffin Jr., . . . [said] [n]ow, America 250 is nothing but a 'branding operation,' according to Griffin, and Biden must act to ensure it is effectively run. 'Each generation's ceiling is the next generation's floor,' Griffin said. 'I'm not willing to turn it over to folks that are not willing to understand and appreciate that. Somebody has to continue to make this commission what it should be.'" [*Washington Post*, April 22, 2022]

Case ID: 230102023

- "I've [Hohns] been spending four years dealing with almost a tragicomic degree of corporate misgovernance," [*Philadelphia Magazine*, June 27, 2022]

- "According to Hohns, the commission, in contravention of its own bylaws, has never approved any of the foundation's contracts or annual budgets, despite the fact that the foundation has received, through the federal commission, nearly $20 million in appropriations." [*Philadelphia Magazine*, June 27, 2022]

- "Hohns claims DiLella is running the commission like it's his personal business. "I think it's *our* business," Hohns says, "as in the people's business." [*Philadelphia Magazine,* June 27, 2022]

- "Dan just shuts everybody down," Griffin says. "It's not his commission; it's the country's. He's running it like Trump tried to run the damn government." [*Philadelphia Magazine,* June 27, 2022]

(The above statements are collectively referred to herein as the "Defamatory Statements.") (The articles from the *Wall Street Journal*, *Washington Post*, and *Philadelphia Magazine* are attached hereto as Exhibits "C," "D," and "E," respectively.)

71.     The Defamatory Statements made by Defendants as set forth above were all false, misleading, and/or implied falsehoods, and they were all directed at Plaintiffs with the clear intent of harming their reputations and interfering with their roles on the Commission and with the America250 Foundation.

72.     In reality, DiLella and Giordano have not committed any of the wrongful acts of which Defendants accused them.

73.     They both have worked tirelessly with undivided loyalty, always acting in the best interest of the Commission and the American 250 Foundation.

74.     Indeed, internal investigations and reviews of all DiLella's and Giordano's decisions and acts for the Commission and the America250 Foundation have determined there was no evidence of the alleged wrongdoing.

Case ID: 230102023

75.     Despite knowing the foregoing, Defendants have failed and refused to publish retractions of the false and defamatory statements.

76.     At all times referred to in this Complaint, Defendants published their Defamatory Statements with "actual malice" in their campaign to defame Plaintiffs, knowing the Defamatory Statements were false and/or recklessly disregarding the falsity of their Defamatory Statements.

77.     Both DiLella and Giordano have suffered serious and long-lasting reputational harm because of Defendants' false Defamatory Statements, which wrongly accused Plaintiffs of committing egregious wrongs in connection with performing fiduciary duties on a federally created Commission on a national and worldwide stage.

78.     Both DiLella and Giordano have had to respond to inquiries from their family, friends, colleagues, and business associates about the Defamatory Statements, requiring them each time to defend themselves without any certainty that the inquiring party believed the statements were true, and each such time suffering tremendous emotional distress as a result.

79.     DiLella, in addition, has had to answer inquiries from potential business partners concerning the public allegations by Defendants.

80.     Similarly, Giordano had recently sought, but was denied an appointment on a public university board of trustees, for which, prior to the Defendants' Defamatory Statements, he was considered a viable and leading candidate.

81.     Plaintiffs' reputations and positions with the Commission and America250 Foundation have also been severely damaged.

82.     After Defendants' false and defamatory statements, the White House decided to replace DiLella as Chairperson.

14

Case ID: 230102023

83.     Likewise, Giordano has learned that a search for a new Executive Director has started, and he has been asked by the new Chairperson to step down as Executive Director once a replacement for the role is hired.

**COUNT I: DEFAMATION**
**(ALL PLAINTIFFS v. ALL DEFENDANTS)**

84.      Plaintiffs incorporate by reference all other paragraphs of the complaint as though set forth fully herein.

85.     The Defamatory Statements, alone or in combination, have defamatory character and are *per se* defamatory because:

a.   The Defamatory Statements ascribe to Plaintiffs conduct, character, or a condition that adversely reflects upon, and have and will adversely reflect upon, their fitness and/or perceived fitness to be in any position of trust for government-funded commissions, committees or nonprofit entities;

b.   The Defamatory Statements ascribe to Plaintiffs acts and failures to act that are improper and unlawful and impugn their integrity and blacken their personal and professional reputations;

c.   The Defamatory Statements expose Plaintiffs to hatred, contempt, or ridicule, and injure them in their business and/or professions;

d.   The Defamatory Statements lower Plaintiffs in the estimation of the recipients of the statements and deter third persons, including potential employers, clients and co-workers from associating with and/or engaging with them or employing them in any capacity; and

e.   The Defamatory Statements expressly state and/or imply that Plaintiffs acted unlawfully by breaching fiduciary duties to a nonprofit and/or the public, lacked

15

Case ID: 230102023

the integrity in performing their duties as Chairperson and Executive Director, respectively, and may have committed crimes in the handling of public funds.

86.    Any and all persons who have read or heard, or will read or hear the above Defamatory Statements understood, and will understand, the same as having a defamatory meaning.

87.    Any and all persons who have learned, or will learn, about the above Defamatory Statements from another, understood, and will understand, the same as having defamatory meaning.

88.    Any and all persons who have read or heard or will read or hear the above Defamatory Statements will understand that the same applies to Plaintiffs.

89.    Any and all persons who have learned, or will learn, about the above Defamatory Statements from another understood, and will understand, that the same applies to Plaintiffs.

90.    The above Defamatory Statements are false.

91.    Defendants knew, when they published the above Defamatory Statements, that they were false and/or Defendants acted in reckless disregard of the falsity of the Defamatory Statements.

92.    Defendants published the Defamatory Statements negligently, with actual malice and/or in reckless disregard for the truth of the statements.

93.    As a direct and proximate result of the publication of the Defamatory Statements, Plaintiffs have suffered injury, including, but not limited to:

    a.   the statements ascribed to Plaintiffs conduct, character, or a condition that adversely reflects upon, and have and will adversely reflect upon, their fitness and/or perceived fitness to be in any position of trust;

16

Case ID: 230102023

b.  they ascribe to Plaintiffs acts and failures to act that are improper and unlawful and impugn their integrity and blacken their personal and professional reputations;

c.  they expose Plaintiffs to hatred, contempt, or ridicule, and injure them in their business and/or profession;

d.  they have caused Plaintiffs severe emotional distress and physical manifestations of same; and

e.  they may have caused Plaintiffs potential financial harm.

94.     Defendants' Defamatory Statements were made deliberately, willfully, and wantonly in that they were calculated to cause Plaintiffs harm with knowledge that the Defamatory Statements were false.

95.     Defendants' Defamatory Statements were outrageous and warrant the imposition of punitive damages to punish such wrongful acts and deter Defendants from repeating them in the future.

## COUNT II:  FALSE LIGHT
### (ALL PLAINTIFFS v. ALL DEFENDANTS)

96.     Plaintiffs incorporate by reference all other paragraphs of the Complaint as though set forth fully herein.

97.     All of the Defamatory Statements cast Plaintiffs in a false light and Defendants maliciously disregarded the falsity of such statements.

98.     Defendants made these statements with the intent of harming Plaintiffs' reputations in the eyes of their peers and members of their community so that Plaintiffs would be deemed dishonest, untrustworthy and lacking integrity.

17

Case ID: 230102023

99.     As a direct and proximate cause of said false statements, Plaintiffs' reputations have been damaged and their earning capacity has been potentially diminished.

100.     Defendants intentionally cast Plaintiffs in a false light by falsely and adamantly accusing them of mismanaging and/or mishandling public funds, breaching their fiduciary duties and engaging in criminal activity.

101.     Defendants' false statements described above casting Plaintiffs in a false light would be highly offensive to a reasonable person.

102.     As a direct and proximate result of Defendants casting Plaintiffs in a false light, Plaintiffs have suffered severe and permanent damage as set forth above.

### COUNT III:  TORTIOUS INTERFERENCE
### WITH CONTRACTUAL RELATIONS
### (ALL PLAINTIFFS v. ALL DEFENDANTS)

103.     Plaintiffs incorporate by reference all other paragraphs of the Complaint as through set forth fully herein.

104.     Plaintiffs DiLella and Giordano each had contractual relationships with the Commission and the America250 Foundation in connection with their leadership roles as Chairperson and Executive Director, respectively.

105.     As set forth throughout the Complaint, Defendants have purposefully taken actions specifically intended to harm the existing contractual relationship between Plaintiffs, the Commission, and America250 Foundation.

106.     Defendants' conduct in this regard was done without privilege or justification.

107.     As a direct and proximate result of Defendants' tortious conduct, Plaintiffs have suffered actual legal damage as set forth fully herein.

Case ID: 230102023

## COUNT IV:  CIVIL CONSPIRACY
## (ALL PLAINTIFFS v. ALL DEFENDANTS)

108.   Plaintiffs incorporate by reference all other paragraphs of the Complaint as though set forth fully herein.

109.   As set forth throughout this Complaint, Defendants agreed to act together to maliciously defame Plaintiffs in a concerted effort to interfere with Plaintiffs' relationships with the Commission and America250 Foundation.

110.   As set forth throughout this Complaint, Defendants used their Defamatory Statements and engaged in multiple acts intended to prevent Plaintiffs from continuing to lead the Commission and America250 Foundation.

111.   As set forth throughout this Complaint, Defendants acted for the unlawful purpose of maliciously defaming Plaintiffs and unlawfully interfering with Plaintiffs' relationships with the Commission and America250 Foundation.

112.   As set forth throughout this Complaint, Defendants each performed overt acts in pursuance of this scheme to defame Plaintiffs and interfere with Plaintiffs' relationships with the Commission and America250 Foundation.

113.   As a direct and proximate result of Defendants' conspiracy, Plaintiffs have been damaged by the actions of Defendants as set forth above.

**WHEREFORE**, Plaintiffs demand the following relief:

a.      A judgment in favor of Plaintiffs and against Defendants, jointly and severally, for compensatory damages in excess of $50,000;

b.      A judgment in favor of Plaintiffs and against Defendants, jointly and severally, for punitive damages;

Case ID: 230102023

c.     Awarding Plaintiffs all costs of suit, plus pre and post judgment interest; and

d.     Such further legal and equitable relief as the Court may deem just and proper.

Respectfully submitted,

**BOCHETTO & LENTZ, P.C.**

Date: January 20, 2023                    BY:     /s/ George Bochetto
George Bochetto, Esquire
David P. Heim, Esquire

*Attorneys for Plaintiffs*

20

Case ID: 230102023

## **VERIFICATION**

I, Frank Giordano, verify that the statements made in the foregoing Complaint. are, to the best of my knowledge, true and correct.   I understand that false statements made herein are subject to the penalties of 18 Pa. C.S.A. §4904 relating to unsworn falsification to authorities.

Frank Giordano

## <u>VERIFICATION</u>

I, Daniel M. DiLella, verify that the statements made in the foregoing Complaint. are, to the best of my knowledge, true and correct.  I understand that false statements made herein are subject to the penalties of 18 Pa. C.S.A. §4904 relating to unsworn falsification to authorities.

_____
Daniel M. DiLella

# EXHIBIT A

Case ID: 230102023

ROBERT A. BRADY
1ST DISTRICT, PENNSYLVANIA

COMMITTEES:
HOUSE ADMINISTRATION
Ranking Member

ARMED SERVICES
SUBCOMMITTEE ON MILITARY PERSONNEL

2004 RAYBURN HOUSE OFFICE BUILDING
WASHINGTON, DC 20515–3801
(202) 225-4731
FAX: (202) 225-0088

1909 SOUTH BROAD STREET
PHILADELPHIA, PA 19148
(215) 389-4627
FAX: (215) 389-4636

1350 EDGMONT AVE.
SUITE 2575
CHESTER, PA 19013
(610) 874-7094
FAX: (484) 816-0029

2630 MEMPHIS STREET
PHILADELPHIA, PA 19125
(215) 426-4616
FAX: (215) 426-7741

2637 EAST CLEARFIELD STREET
PHILADELPHIA, PA 19134
(267) 519-2252
FAX: (267) 519-2262

www.brady.house.gov

# Congress of the United States
## House of Representatives
### Washington, DC 20515–3801

October 19, 2018

Dear Mr. DiLella:

Congratulations on having been chosen to serve as Chairperson to the United States Semiquincentennial Commission.

As the original sponsor of legislation related to our nation's efforts to celebrate our 250th anniversary in 2009, and as a primary sponsor of the legislation that created the Commission, I care deeply about this project and our national celebration of this incredible civic milestone. In many ways, I believe that the U.S. Semiquincentennial can and should be the greatest civic event in our lifetimes, possessing the ability to unify our nation as we honor our history and our achievements through a series of inclusive, inspiring, and patriotic themes. This celebration will focus worldwide attention on the rich culture and heritage of our 50 states, our 13 founding colonies, and the living history of the Delaware Valley that led to and inspired America's beginnings at Independence Hall, located in the center of the Congressional District I have been so privileged to represent for nearly 20 years.

I am looking forward to working with you and our other fellow Commissioners to develop grand plans for this exciting national milestone, in accordance with the requirements set forth in Public Law 114-196.

As we approach our first meeting on November 16th, my staff and I have been reviewing the law and the developments of the Commission to date. This process has led to a number of questions and topics for discussion regarding the Commission's administration, presented below. I request a written response to these matters not later than November 5th, 2018, so that I may have sufficient time to review your answers prior to our meeting. Since these matters concern the Commission as a whole, I have taken the liberty of copying our fellow Commissioners on this communication.

## EXECUTIVE DIRECTOR APPOINTMENT

In Sec 8(c)(1), the Chairperson is authorized to "appoint and terminate an executive director and such other additional personnel as are necessary to enable the Commission to perform the duties of the Commission."

Earlier this year, you appointed Frank Giordano to serve in this role. Can you please detail the basis upon which Mr. Giordano's application was considered? Specifically, I request that you reply to each of the following questions:

Case ID: 230102023

1. Was the position of Executive Director advertised to solicit interest from prospective applicants? If so, by what means did you advertise the opportunity? How many applications did you receive? How many of these applicants did you interview?
2. Can you please provide a copy of the job description used to advertise the position?
3. Can you please confirm that you employed an approach to solicit interest from a diverse pool of applicants, including women and minority candidates?
4. What were the primary factors that you used to determine the qualifications of these applicants (e.g. relevant professional experience in public private partnerships, large scale event planning and public safety knowledge, fundraising experience for national milestone events, expertise on themes related to US history and civic engagement, or other factors?)
5. Did you consult other Commissioners prior to your nomination of Mr. Giordano?
6. It appears that Mr. Giordano has been holding himself out to the public as the Executive Director of the United States Semiquincentennial Commission without having been considered or confirmed by the Commission. Is this accurate? Are you aware of this?

It appears from searching sources available on the internet that Mr. Giordano was and continues to be employed as President and CEO of Encore Series Inc, the presenter of the Philly Pops Orchestra. It also appears that you serve as a member of the Board of Directors of Encore Series, Inc for the period of 2017-2018.

7. Is it the case that Mr. Giordano continues to be employed by Encore Series, Inc., in this capacity?
8. Is it the case that you served as a Director of Encore Series, Inc., at the time of your nomination of Mr. Giordano?
9. Do you still serve in this capacity?
10. If the answer to questions 7, 8, or 9 is affirmative, please detail the manner in which you have identified and avoided any conflicts of interest in respect of this appointment and your role as a member of the governing body of Mr. Giordano's current employer.
11. If Mr. Giordano does still serve as President and CEO of Encore Series, Inc., can you please set forth the basis of his employment in terms of full time status, duty of care, scope of responsibility, and number of employees under his supervision?

In Sec 8(c)(2), the employment of any individual in the role of Executive Director is subject to the confirmation of the Commission.

I intend that the Commission will discuss this as a matter of business in our upcoming meeting in Philadelphia.

<u>ADMINISTRATIVE SECRETARIAT</u>

Earlier this year, the Department of Interior named American Battlefield Trust (f/k/a Civil War Trust) as the Administrative Secretariat of the Commission. As detailed in Sec. 9(b) of the Statute,

the role of the Administrative Secretariat is to serve "as the point of contact under section 5(e)," to "house the administrative offices of the Commission," to "assume responsibility for funds of the Commission," and to "provide to the Commission financial and administrative services, including services related to budgeting, accounting, financial reporting, personnel, and procurement."

> 12. Please share a copy of the contract by which American Battlefield Trust will serve in this capacity to the Commission, so that the Commission may evaluate and ratify such contract to ensure that the scope is consistent with and limited to the scope set forth in the statute.

I intend that this matter be reviewed in detail at our upcoming meeting by Commissioners.

OTHER ADMINISTRATIVE MATTERS

The statute sets forth several items around which the Commission is clearly delinquent, including the development and submission of various reports and plans to Congress and the President. Notwithstanding some delays in scheduling our first meeting, I trust that you are committed to rectifying these delinquencies in a timely way, so that we can get on with the important business of the Commission.

> 13. Have any reports or other materials been submitted on behalf of the Commission to any Federal Agency or Department, or to Congress? As the Commission has not yet met, I assume this is not the case, but I would appreciate your confirmation of this, and also to understand in more detail your plan for these submissions.

> 14. Further, I request that you set forth the basis on which the Commission will conduct its business in terms of transparency, record-keeping, and to what extent the Commission's business is subject to the Freedom of Information Act.

> 15. Can you please update me on the status of the various reports to be submitted to the Commission from Department of Interior, the Smithsonian, the Library of Congress, and the National Archives, as set forth in Sec. 6 of the statute? Have you formally requested that these reports be produced?

Additionally, I would like you to know that it is an important principal for me that the business of the Commission be conducted in a manner that stimulates the utmost degree of public participation and involvement.

> 16. To this end, please describe your approach for ensuring public access to the hearings of the Commission, and the basis upon which the Commission will report on its progress from time to time.

Thank you in advance for your timely response to this letter.

Case ID: 230102023

Once again, I wish to offer you my congratulations on your appointment as Chairperson to the United States Semiquincentennial Commission. There is so much that the federal government can contribute to the success of this important national milestone over the course of the next eight years. I am looking forward to getting to know you better and working more closely with you and our fellow commissioners to ensure that the 250th anniversary of the United States fulfills its true potential as the greatest civic moment in American history.

Sincerely,

Robert Brady
Member of Congress

cc: Commissioners of the United States Semiquincentennial Commission

Case ID: 230102023

# **EXHIBIT B**

Case ID: 230102023

**ROBERT A. BRADY**
1ST DISTRICT, PENNSYLVANIA

COMMITTEES:
HOUSE ADMINISTRATION
RANKING MEMBER

ARMED SERVICES
SUBCOMMITTEE ON MILITARY PERSONNEL

**Congress of the United States**
**House of Representatives**
**Washington, DC 20515—3801**

2004 RAYBURN HOUSE OFFICE BUILDING
WASHINGTON, DC 20515—3801
(202) 225—4731
FAX: (202) 225—0088

1909 SOUTH BROAD STREET
PHILADELPHIA, PA 19148
(215) 389—4627
FAX: (215) 389—4636

1350 EDGMONT AVE
SUITE 2575
CHESTER, PA 19013
(610) 874—7094
FAX: (484) 816—0029

2630 MEMPHIS STREET
PHILADELPHIA, PA 19125
(215) 426—4616
FAX: (215) 426—7741

2837 EAST CLEARFIELD STREET
PHILADELPHIA, PA 19134
(267) 519—2252
FAX: (267) 519—2262
www.brady.house.gov

December 1, 2018

Dear Mr. DiLella:

I write to follow up on my letter of October 17, 2018. In my letter, I raised various questions regarding the U.S. Semiquincentennial Commission. As a primary sponsor of the legislation that created the Commission, ensuring that we get these details right is a priority for me.

I appreciate the time that you and Frank Giordano have taken to address my questions and concerns over the past month and a half. I have known Frank and his family for many years and never doubted or lacked confidence in his ability to serve as the permanent Executive Director of the Commission. My commitment has been to ensure that a process was in place to deliver the best candidate for the job, and that all the Commissioners were involved and consulted.

Now that the first meeting of the Commission has been held, and Frank Giordano has served as our Commission's interim, I encourage you to execute and finalize the process for installation of the permanent Executive Director as expeditiously as possible. It's time to get to the work of the Commission and planning the celebration of our nation. Given the process you have proposed, the work Frank Giordano has done to-date and his background and experience, I do not believe an executive search is necessary or a wise use of the Commission's time and resources. Frank Giordano has my full support and confidence moving forward, pending the conclusion of your process, to serve as the permanent Executive Director of the United States Semiquincentennial Commission.

Thank you for your efforts to move this important Commission forward.

Sincerely,

Robert Brady
Member of Congress

cc: Commissioners of the United States Semiquincentennial Commission

PRINTED ON RECYCLED PAPER

Case ID: 230102023

# EXHIBIT C

Case ID: 230102023

# Planners Battle Over Marking U.S. 250th Anniversary

## The federal effort to commemorate 2026, mired in dissension, faces allegations of impropriety



Frank Giordano, executive director of the U.S. Semiquincentennial Commission, signing an agreement in August at the Library of Congress to help commemorate the 250th anniversary. JESS BRAVIN/THE WALL STREET JOURNAL

Case ID: 230102023

By Jess Bravin

Follow

Mar. 19, 2022 11:00 am ET

SAVE

SHARE

TEXT

Listen to article

Length 9 minutes

Queue

PHILADELPHIA—The federal commission charged with commemorating 250 years of American independence in 2026 is at war with itself over allegations of featherbedding, favoritism and misappropriation of taxpayer funds.

At a closed-door meeting last week, the U.S. Semiquincentennial Commission voted 12-10 to support its chairman, Pennsylvania developer Daniel DiLella, whom dissenting commissioners accuse of improperly transferring the body's functions and federal appropriations to the private America250 Foundation, which he and his allies control.

The foundation, the commission and an affiliated nonprofit—collectively called America250—were sued on discrimination claims last month by four female former executives of the foundation who allege they were effectively forced out by the "boys club" running the project after objecting to what their lawsuit says was "cronyism, self-dealing, mismanagement of funds, potentially unlawful contracting practices and wasteful spending." The foundation denies the allegations.

With Mr. DiLella's leadership under fire, his allies put forward a resolution that augments his power, reduces public access to official proceedings and limits members' ability to vote on budget and planning issues or speak at commission meetings. Mr. DiLella convened the March 9 session over Zoom and proceeded to a vote without debate.

Several commissioners, including some members of Congress, sought to speak, people who attended said. Rep. Bonnie Watson Coleman (D., N.J.) held up a sign reading, "I Demand to Be Heard." Mr. DiLella ignored both her and Rep. Robert Aderholt (R., Ala.), who also asked to speak, said former Rep. Joseph Crowley (D., N.Y.), who serves on the commission as a private citizen.



A screenshot of the commission's Zoom meeting in March showing Rep. Watson Coleman and former Rep. Crowley holding up signs; Rep. Aderholt is also present, in a blue shirt in the fourth row.

"What was done was very authoritarian and not at all in the Spirit of '76," Mr. Crowley said. Mr. DiLella has said the changes would make America250 operate more like a business, people who spoke with him said.

Some members say Mr. DiLella should step down.

"We've suffered through four years of these antics with no vision at all for 2026," said Commissioner Andrew Hohns, chief executive of Philadelphia investment firm Newmarket Capital. "There has been little to no focus on the hard work of historic preservation, capital and community investment, and planning for the celebration or building its legacy."

ADVERTISEMENT



Commissioner Andrew Hohns, chief executive of Philadelphia investment firm Newmarket Capital, photographed in 2018.PHOTO: LISA LAKE/GETTY IMAGES FOR BARNEYS NEW YORK

Mr. DiLella, chief executive of Equus Capital Partners Ltd., declined interview requests.

"We have hit many roadblocks along the way, and there may be more," he said through a spokesman, "but we are on the right path to fulfill our sacred mission to honor this great country."

America250's tentative plans include an online showcase of attractions such as the Sturgis, S.D., motorcycle rally and the park in the Compton, Calif., area where Serena and Venus Williams learned to play tennis, according to a presentation viewed by The Wall Street Journal. Also proposed are a Young People's Continental Congress and a

television cooking show called "The Great American Mixing Bowl." A National Semiquincentennial Convention that assembles "delegates from every corner of the USA to engage in constructive dialogue regarding our country's next 250 years" would cap the project, the presentation says.

The foundation, which was chartered to raise funds for the commission, set a fundraising goal of $250 million, with a $10 million target for this year and $50 million in 2023, according to a March report viewed by the Journal. It has had little success so far in lining up corporate sponsors. Walmart Inc., Home Depot Inc. and Bank of America Corp. were approached but have made no commitments, people familiar with the matter say. A spokesman for Bank of America declined to comment; representatives of Walmart and Home Depot didn't immediately respond to requests for comment.

Facebook parent Meta Platforms Inc. is the sole national sponsor to date, agreeing to provide $10 million over five years in exchange for a role in planning and presenting the observances; after the discrimination allegations were reported, Meta said it was reviewing the arrangement.



Meta headquarters in Menlo Park, Calif. Meta says it is reviewing the sponsorship arrangement made with the America250 Foundation. PHOTO: JUSTIN SULLIVAN/GETTY IMAGES

Meta has provided $2 million so far, making the company the foundation's second-biggest funding source. The first is the commission itself, which has transferred $11.8 million to the foundation, according to a December internal report viewed by the Journal.

Congress established the Semiquincentennial Commission in 2016 and has so far allotted nearly $30 million for planning and events leading to July 4, 2026. Eight lawmakers and 16 private citizens, appointed in equal numbers by Democratic and Republican congressional leaders, make up the voting members. Cabinet secretaries, heads of federal institutions such as the Smithsonian and retired Supreme Court Justice Anthony Kennedy hold nonvoting seats.

The Semiquincentennial's troubles recall those of the American Revolution Bicentennial Commission, assigned in 1966 to plan for the 200th anniversary. Congress scrapped the panel in 1973 in the midst of allegations of political favoritism, commercialism and mismanagement. President Richard Nixon tapped Navy Secretary John Warner to salvage a scaled-down observance ahead of July 4, 1976.

ADVERTISEMENT

While the Bicentennial project was the subject of presidential addresses, congressional hearings and newspaper investigations, Semiquincentennial planning has attracted little attention. Some say that is partly because Mr. DiLella has given leadership roles to his connections in the Philadelphia business community who lack expertise in public history or planning events on the scale of a world's fair or the Olympic Games.



A presentation that was shown during the Zoom meeting in March describes the commission's plans and shows examples of potential attractions, including a television cooking show called 'The Great American Mixing Bowl.'

Mr. DiLella named his friend Frank Giordano as the commission's executive director, at a $156,000 government salary, disregarding an early commission vote to conduct a nationwide search. Mr. Giordano holds two other jobs: chief executive of both Encore Series Inc., producer of the Philly Pops, and his family business, Atlantic Trailer Leasing

Case ID: 230102023

Corp. He sits with Mr. DiLella on the boards of Encore Series, the National Italian American Foundation and Roman Catholic High School, which Mr. DiLella attended. Both men are past presidents of the Union League of Philadelphia, a private club, and remain board members.

According to the former employees' lawsuit, Mr. Giordano works for the Semiquincentennial about 10 hours a week. An America250 spokesman said he works 40 hours. The spokesman issued a statement saying that Mr. DiLella acted within his powers as chairman. "Any inference that Mr. Giordano's appointment was not in conformity with law is not based in fact or law," the statement said.

Mr. Giordano didn't respond to requests for comment.

Foundation counsel Thomas McGarrigle sits on the Union League board too, as does commission counsel Joseph Del Raso, who is also on the Encore Series and Italian American boards.



Daniel DiLella, CEO of Equus Capital Partners Ltd. and chairman of the U.S. Semiquincentennial Commission and the America250 Foundation.PHOTO: BUSINESS WIRE/ASSOCIATED PRESS

Mr. McGarrigle didn't respond to a request for comment, but his law firm, Reed Smith, said in a statement that its lawyers had provided hundreds of hours of pro bono work in the foundation's early days. "Since the Foundation has received funding, the firm continues to provide representation when requested at significantly reduced hourly rates," the firm said.

Mr. Del Raso didn't respond to a request for comment.

Case ID: 230102023

Mr. DiLella hired the daughter of his firm's vice president as director of communications and operations in his commission chairman's office, and a former Equus intern for a similar job in his separate capacity as foundation chairman. Mr. DiLella, who attended Villanova University, endowed a real-estate center there and serves on the school's board of trustees, has brought on several of its alumni: Mr. McGarrigle, Mr. Del Raso and the two chairman's aides all are graduates, as is Richard Subbio, the commission's government-relations director.

Mr. DiLella selected Maven Communications, which does publicity for his company, to handle America250's public relations. According to the December report, Maven has received $610,000 so far. Rebecca Devine, its co-founder, is Mr. DiLella's colleague on the Roman Catholic High School board. Mrs. Devine didn't respond to a request for comment.

---

SHARE YOUR THOUGHTS

---

*How should the 250th anniversary of the United States be commemorated? Join the conversation below.*
Mr. DiLella was appointed to the commission in 2017 on advice of Sen. Patrick Toomey (R., Pa.), who also serves as a commissioner. A year later, President Donald Trump named Mr. DiLella chairman.

Last year President Biden renewed Mr. DiLella's chairmanship at the urging of Commissioner David Cohen, a former Comcast Corp. executive who now serves as ambassador to Canada, people familiar with the matter say.

"The president chose to redesignate Dan DiLella based on several recommendations from people who know him and his work," a White House official said.

**Write to** Jess Bravin at jess.bravin+1@wsj.com

# EXHIBIT D

Case ID: 230102023

**LOCAL**

# Commission to honor America's 250th birthday is 'toxic,' lawsuit says



By Justin Wm. Moyer
Today at 6:00 a.m. EDT

**Listen to article**
8 min

Anna Laymon, right, and Renee Burchard, center, two of the plaintiffs in a lawsuit against the America 250 project, talk with attorney Pam Keith in Washington. (Bill O'Leary/The Washington Post)

When Renee Burchard went to work for the America 250 Foundation in 2020, she was excited. After a long career in politics and nonprofit management, she had the chance to work for a congressionally-funded commission tasked with helping the United States celebrate its 250th birthday, or semiquincentennial — a commission that hoped to raise $250 million.

**Get the full experience.** Choose your plan

But after working for the foundation for less than two years, Burchard resigned in December and sued in February, alleging the foundation had done nothing to further its mission, instead corruptly funneling federal funds to its leadership and favored contractors in a toxic, sexist environment.

The complaint alleged "cronyism, self-dealing, mismanagement of funds, potentially unlawful contracting practices and wasteful spending."

Story continues below advertisement

"This was run by a cabal," Burchard said of the foundation. "Everything had to go through the cabal."

Burchard is one of four female executives who filed a federal suit against America 250 in February, saying they had no choice but to resign from an organization that paid them less than male employees and ignored them when they raised concerns about its purpose and business practices.

The suit, which sought an investigation of America 250 and lost wages, comes as members of the commission and lawmakers tasked with overseeing the commission publicly battled the man who runs it — a President Donald Trump appointee left in place by President Biden.

Story continues below advertisement

America's big birthdays do not come often — even some Gen Xers have no memories of the nation's bicentennial celebration held in 1976. Thus, for the upcoming bash in 2026, Congress created the Semiquincentennial Commission in 2016 to mark "the national heritage of the United States of individual liberty, representative government and the attainment of equal and inalienable rights."

Case ID: 230102023

Filed in U.S. District Court in D.C., the suit recounted the formation of the America 250 Foundation — the commission's "operational arm." Funded by appropriations, donations and sponsorships, America 250 has received $20 million in federal funds so far, according to the suit.

The commission's unpaid chair is Daniel DiLella, a Philadelphia businessman appointed by President Trump in 2018. In the past two years, the suit alleges, DiLella has staffed the foundation with friends, improperly steering contracts to businesses with which he had "personal dealings or relationships, that created a potential conflict of interest and/or had questionable prices in services."

*Opinion: Remember the Bicentennial? Celebrating might be even harder for America's 250th birthday.*

Burchard and three other women quit the foundation when "they could no longer participate in noncompliant, unlawful and/or fraudulent use of taxpayer funds, and could no longer endure a toxic and volatile work environment," the suit said.

Story continues below advertisement

In a court filing on April 7, attorneys for America 250 said the lawsuit "fails to articulate sufficient facts to set forth any cognizable claim."

"At bottom, the Complaint contains unsupported allegations and speculations regarding Plaintiffs' collective disagreements on management decisions during their employment," the filing said.

The White House declined to comment.

In a telephone interview, DiLella also declined to comment on the lawsuit's allegations. However, DiLella said, the commission had "no money, no organization, and no appropriation" when he took over in 2018.

When many commissioners did not return his phone calls looking for resources, he said, he donated $250,000 of his own money and turned to his friends to raise around $3 million to "open the doors."

Story continues below advertisement

"We had absolutely nothing," he said. "It was just dumped in my arms."

Burchard said she saw working for America 250 as the "cherry on top" of her career. With the country newly focused on racial justice, she said, the semiquincentennial could put the bicentennial in context through programs mounted across the country by historians.

"We're looking at America 250 years behind us but also equally 250 years ahead of us," she said. "This whole thing was going to set that up."

The foundation's never lived up to its potential, according to Burchard and her co-plaintiffs. In over 60 pages, their complaint alleges they were "retaliated against, shunned, isolated, humiliated and undermined because of their activities as whistleblowers" and "subjected to a hostile work environment because of their gender."

Story continues below advertisement

Burchard alleged in the suit that she was told to pay $30,000 worth of invoices "for which there were no contracts and no proof that work had been done." The suit also said she expressed concerns about a "potentially unlawful quid-pro-quo" between America 250 and Facebook's parent company, Meta, which gave the foundation $10 million in exchange for rights to map national parks with drones "for its own business purposes" — using the "pretense" that the mapping was an America 250 program. (Meta did not

Case ID: 230102023

respond to a request for comment. The National Park Service, which is not a party to the lawsuit, declined to comment.)

Meanwhile, the foundation's president assigned Burchard secretarial duties and told her she "needed to learn how to serve him," the suit claimed.

The suit also alleges that Keri Potts, another plaintiff and a sexual assault survivor who has been profiled in The Washington Post, was disparaged by a fellow employee "in a drunken, sexist tirade to a work peer," calling her "a b----" who "probably made up the claim she is a survivor."

Story continues below advertisement

Potts resigned after some commissioners questioned the foundation's "waste and misappropriation," the suit said, concluding "she could not refute them because they were largely true."

In an interview, Potts said America 250 has a "sacred privilege" to represent the nation as its 250th anniversary approaches — one that the foundation was not living up to.

"I'm the PR person," she said. "I'm not Houdini. These are disastrous decisions. I'm not putting my name on that."

Some commissioners, however, praised America 250. In an emailed statement, Commissioner Val Crofts said the majority of the commission was "energized and excited for a commemoration that will make this country proud."

Story continues below advertisement

Programs like the Young People's Continental Congress, an America 250 partner program that will bring students to Philadelphia in an event modeled on the First Continental Congress, offer "hands-on experience in discussing contemporary issues and proposing changes and ideas to improve them," the statement said.

"The Foundation staff has also designed a detailed plan for any and all Commissioners who want to be a part of the planning process," the statement said. "I know that many of my fellow Commissioners have done so and I call on my colleagues who have not to take them up on this opportunity."

In a letter to the foundation in February, three lawmakers on the commission — Sen. Robert P. Casey Jr. (D-Pa.), Rep. Bonnie Watson Coleman (D-N.J.) and Rep. Dwight Evans (D-Pa.) — said America 250 should launch an investigation into the women's claims.

Story continues below advertisement

At a virtual meeting last month, Coleman held up a sign reading "I Demand to Be Heard" after DiLella refused to let her speak, as the Wall Street Journal reported.

"The Commission was established to honor the American people and their 250 years as a nation," the letter said. "Its activity should not be unnecessarily obfuscated, and its conduct should be held to the highest standard."

This is not the first time drama has threatened to derail an American anniversary. Bicentennial celebrations in 1976 were held only after a federal commission "later abolished by Congress for ineptitude ... spent 6½ years arguing over an appropriate national celebration and finally recommended that there be none," according to a 1975 Time magazine article. The nation's 150th, also celebrated in Philadelphia, was also plagued by debt, low attendance and bad weather.

Andrew Hohns, a member of the commission who opposed the rule changes, said in an interview that the nation's anniversaries are important opportunities for education and infrastructure-building. For example, he said, South Philadelphia swampland drained

Case ID: 230102023

for the nation's 150th birthday celebration is now home to the city's sports stadiums and public parkland.

America 250 should be mustering resources for a wide array of programming — everything from organizing volunteer projects for high school students to promoting childhood nutrition that will strengthen the "social fabric," according to Hohns. Instead, the foundation, which has about 2,000 Instagram followers, has unsuccessfully focused on building its brand, he said.

"I'm not at all comfortable with the way things stand," Hohns said. "This is a very significant abuse of this public institution."

Commissioner Noah Griffin Jr., who also opposed the rule changes, said he is one of the commission's few African Americans. Griffin's grandfather was an enslaved person, he said, and he joined the commission to make sure Black stories were told. Now, America 250 is nothing but a "branding operation," according to Griffin, and Biden must act to ensure it is effectively run.

"Each generation's ceiling is the next generation's floor," Griffin said. "I'm not willing to turn it over to folks that are not willing to understand and appreciate that. Somebody has to continue to make this commission what it should be."

Case ID: 230102023

# EXHIBIT E

Case ID: 230102023

# The Ugly Philly-Centric Feud at the Center of America's 250th Birthday Celebration

Two opposing camps in Philadelphia are vying to dictate how the country celebrates its upcoming Semiquincentennial, complete with accusations of cronyism, sexism, double-dealing and bad faith. But hey, why should our 250th anniversary be different from anything else these days?

*by* **DAVID MURRELL** *. 6/27/2022, 11:34 a.m.*

Get a compelling long read and must-have lifestyle tips in your inbox every Sunday morning — great with coffee!

Subscribe



The fight for USA's 250th birthday is starting to look like *The Battle of Bunker's Hill*. Painting by John Trumbull/Yale University Art Gallery

Case ID: 230102023

Independence Hall. A glorious spring day. Enthused parents and less-enthused teenagers march around, gazing up at the bronze statue of Commodore John Barry, his outstretched arm pointing majestically into the distance. Andrew Hohns sits on a wooden park bench, taking in the scene. As a kid, Hohns used to pass beneath the arches of Independence Hall on walks across the city — historical engagement via osmosis. Now, he's looking soberly at the fences and bollards restricting access. "It turns the building into something held apart," he says, "when in fact, I think it's actually something that's very much *a part* of the city and the landscape."

If there's one thing Hohns would change about Independence Hall, it might be this. And Hohns has been thinking a lot about what he might change lately — not just inside Independence National Historical Park, but across the city, because in four years, the United States will celebrate its Semiquincentennial, the convolutedly named occasion of its 250th anniversary. Hohns has an almost mystical faith in the power of round numbers, and as far as round numbers go, you can't do much better than 250 — a quarter-millennium! In 2011, Hohns, who's the CEO of an investment firm, founded USA250, a nonprofit with the self-appointed task of planning for the nationwide celebration and ensuring that it be headquartered in Philadelphia. What Hohns has in mind for 2026 is less a big party (though there's that, too) and more a giant wave of investment that he hopes will set off a cascade of development, infrastructure improvements, and historical preservation that will last, at least, through the next 50 years. "The minimum budget for the celebration should be $2.5 billion," says Hohns. "But better yet, $20.26 billion!"

On this April day at the park, Hohns, who's 44 — tall and well-dressed, with a boyish shock of black hair just beginning to show signs of gray — is taking me on a tour across the city to the sites of the 1876 Centennial, the 1926 Sesquicentennial, and the 1976 Bicentennial, as a kind of historical proof of concept that his ambitious vision for 2026, far from being exceptional, has been the historical norm for Philly.

"We're surrounded by the Semiquincentennial in the form of trees," Hohns says, beginning our tour from the bench. He turns and points to a tree behind him: It's an emaciated thing, a late bloomer, with only the faintest signs of green buds. "This tree was the first patriotic gift in honor of the Semiquincentennial," he says — one of 76 saplings planted alongside Independence Hall by the Daughters of the American Revolution. This is meant as an optimistic point about progress already under way — new life, future growth. It's difficult to suppress, however, the creeping thought that

this skeleton of a tree is doing a pretty good job symbolizing how the planning for the 2026 Semiquincentennial has been going so far: not well.

In 2016, after considerable lobbying on the part of Hohns, Congress passed a law creating the United States Semiquincentennial Commission, the official body tasked with planning the celebration. Despite its national provenance, the commission, made up of eight elected officials and 16 private citizens appointed by leadership in Congress, has retained a distinctly local flavor: Seven of its members, including its two top officials, are from Pennsylvania. All seven are men; all but one are white. There's the political and power-broker cohort: senators Bob Casey and Pat Toomey; U.S. Representative Dwight Evans; former Representative Bob Brady; former Comcast exec and current ambassador to Canada David L. Cohen. Then there's the Union League cohort: chairman Dan DiLella, a real estate CEO and former Union League president who has been a major contributor to Toomey's campaigns and was asked to join by him, plus Frank Giordano, Philly POPs president and fellow former Union League president, who was appointed executive director by DiLella. (DiLella and Giordano are longtime friends, and DiLella serves on the board of the Philly POPs.) Hohns, too, is a commissioner, and he, too, is part of the Union League, his membership a gift from when he graduated from Penn.



Andrew Hohns, founder of USA250, at Independence Hall in May / Photograph by Dan Lidon

Perhaps unsurprisingly, considering the insular, tribal group of Philly power players who make up its membership, the commission has been beset by infighting more or less from the moment it was created. One of DiLella's first

Case ID: 230102023

acts, in November 2018, was to name Giordano executive director without performing a national search, which infuriated Hohns. (The commission responded by voting to perform a national search, but DiLella reported back, after a year, that he'd been unable to hire a pro bono search firm, and Giordano was permanently confirmed.) Nor does Hohns feel that the commission has sufficiently monitored the America250 Foundation, the nonprofit partner that was created in 2019 to run the day-to-day planning for the Semiquincentennial. "I've been spending four years dealing with almost a tragicomic degree of corporate misgovernance," he says. According to Hohns, the commission, in contravention of its own bylaws, has never approved any of the foundation's contracts or annual budgets, despite the fact that the foundation has received, through the federal commission, nearly $20 million in appropriations. There have been contentious meetings, mid-speech mutes on Zoom, and more righteous sermons about procedures and freedom of speech than one would think possible. Additionally, in February, four female former executives sued the foundation, alleging a sexist work environment and unequal pay practices and citing a series of non-competitive contracts they claimed had been doled out to companies and consultants with close ties to Giordano and DiLella. The contracts, the suit alleges, amount to "fraud, waste and abuse of federal funds." All of which points to the fundamental dilemma: To place a celebration of American history in Philadelphia is to inevitably run up against this city's own history of self-dealing or, depending on one's level of charitableness, corruption. Now, Hohns is growing worried that the Semiquincentennial has already fallen into the familiar trap and is at grave risk of being stillborn years before it's even set to begin.

•

**FOR OBVIOUS REASONS,**  Philadelphia has long played a central role in America's round-number anniversaries. As Hohns explains repeatedly on our tour, no small part of the city's current environment has links to 1776. We make our way to Fairmount Park, site of the 1876 Centennial World's Fair. The fairgrounds are long gone, so Hohns heads to the Please Touch Museum to provide the next best thing. Dodging children, we descend to the basement, where Hohns stands reverently before a giant glass-encased box that looks like one of those three-dimensional maps generals use for war planning: a scale model of the 1876 fairgrounds. That year's World's Fair was both a massive expenditure — $11 million total, equivalent to $300 million today —  and a massive success, with 10 million people, or roughly 25 percent of the nation's population, attending the festivities.

Hohns points out the main exhibition space, an ornate but temporary 21-acre hall that was the largest building ever constructed at the time; the torch of the Statue of Liberty, which attendees could ascend; the exposition pavilions of 24 states, where people could meet local elected officials and learn about what goes on in Mississippi or Nevada. There were more than 200 buildings in all, including, as it happens, the one we're standing in. What now houses the Please Touch Museum was once known as Memorial Hall, home to the Centennial's art exhibit. "This was all built within, like, two years," Hohns says as he walks around the model. "We can do this. *We can do this.*" It sounds more like a plea than a promise.

The other commemorations haven't been quite as exceptional. The best thing you can say about the 1926 Sesquicentennial is that no one is alive to remember it. As historian Thomas Keel writes in *Sesqui!: Greed Graft, and the Forgotten World's Fair of 1926*, the City of Philadelphia lost at least $10 million (more than $100 million today) on the celebration, which took place amid a combination heat-and-rain wave; it rained on 107 of the fair's 184 days. Scandalously, the fairgrounds were built, not in Fairmount Park, but in the theretofore uninhabited swamplands of South Philadelphia, thanks to "omnipotent political boss" William S. Vare, whose puppet mayor, Freeland Kendrick, a former pawnshop owner, ensured the fair would be held in his benefactor's political stronghold. Still, even this corrupt, dilapidated celebration managed to produce lasting projects. Those swamplands? They're now FDR Park. And the stadium complex? We owe that to the Sesquicentennial, too; the Municipal Stadium, which stood until 1992, was built for it.

And then there's the Bicentennial, still remembered by many city residents as an epic flop that produced a series of only-in-Philadelphia unfortunate events: then-mayor Frank Rizzo ordering out-of-towners who were "bent on violence" to stay away from the city and requesting (to no avail) 15,000 federal troops for protection; labor conflicts leading to the untimely closure of exhibitions, including the Art Museum on July 5th; hugely ambitious plans, like a proposed $1 billion structure to be built above 30th Street Station to house the festivities, left unrealized. (There was one bit of monumental architecture: a five-story, 49,000-pound birthday cake, covered in red, white and blue icing, on display in Fairmount Park.) The planning of the Bicentennial, historian Scott Gabriel Knowles writes in *Imagining Philadelphia*, ultimately served to "reflect the clashing ambitions of citizens caught in a declining American industrial metropolis."

Setting aside any present-day historical parallels, Hohns has a different take on the Bicentennial. If nothing else, he argues, it triggered, not unlike the Sesquicentennial before it, a significant amount of infrastructure: the Declaration House at 7th and Market streets, where Thomas Jefferson composed the Declaration of Independence (now part of Independence National Park); the African American Museum; the Mummers Museum. "What if every 50 years there was a wave of major investment in the nation's founding city?" Hohns says. "Wouldn't that be good?"

Hohns has a kind of innate magnetic pull toward gigantic ideas — including for himself. By the time he was 26, he'd already run for (and lost) the state House twice and was openly talking of one day running for mayor. He never did make that run — at least, not yet — and these days, he seems to have transferred his civic energy to the Semiquincentennial.



Members of the U.S. Semiquincentennial Commission at the White House in January 2020: from left, Pat Toomey, Robert Aderholt, Lynn Forney Young, David L. Cohen, Cathy Gillespie, Mike Pence; James L. Swanson; Dan DiLella, Rosie Gumataotao Rios and Frank Giordano. / Photograph via Danvis Collection/Alamy Stock Photo

"What are the things that we can motivate in connection with the 250th anniversary that might otherwise not be possible within that kind of window?" he asks. In typical Hohns-ian fashion, he's got no shortage of answers. He

Case ID: 230102023

proposes new infrastructure at Independence Hall (classroom space for students; a room devoted to the nation's historic flags), new investment programs ("Commercial programs to renovate facades, incentives to get all of the building owners to make generational investments. Why not? It's worth it!"), and a suite of events — all 50 state legislatures holding honorary sessions inside Independence Hall in 2026, say, and a roving open-air exhibition, held on barges, that would travel from city to city, culminating here, on the banks of the Delaware. This wasn't mere daydreaming. By 2014, Hohns's USA250 nonprofit had hired a full-time executive director and secured millions of dollars in provisional commitments from big-name companies, including Walmart and Johnson & Johnson.

In 2018, when it came time for the federal government to select the U.S. Semiquincentennial Commission's official nonprofit partner, Hohns figured USA250, as the undisputed leader in Semiquincentennial planning — not to mention the only nonprofit with millions in sponsorship commitments — would be a shoo-in. But the government didn't choose USA250; it selected the American Battlefield Trust, an older nonprofit whose main line of work involves restoring Civil War battlefields. (It also had ties to the Trump administration; the brother of the trust's president was the U.S. Trade Representative, a cabinet-level position.) This left Hohns perplexed. He became even more perplexed when, four months later, the trust decided it wasn't equipped to plan the celebration after all, which led to the creation of the America250 Foundation, the nonprofit that remains the main planning entity today. "I mean, why did [the trust] even apply for this role?" Hohns says. "I don't understand."

Hohns did understand this much: He had moved, along with USA250, from the forefront to the sidelines.

•

**ANNA LAYMON HAD BEEN** warned. It was January of 2021, and she'd just capped a successful tour as executive director of the federal commission charged with commemorating the 100th anniversary of women's suffrage. The world of federal commissions planning the nation's various anniversary celebrations is small, and Laymon was already beginning to hear about the America250 Foundation. "They had a reputation for being a total disaster," she says. Still, when she was offered a job as the foundation's vice president of programs and planning — essentially the chief planner for the Semiquincentennial — she decided it was worth the risk. "Well, I can make

this place better," she thought. "And if I turn my back on it, it's not going to get any better."

It didn't take long for Laymon to realize the warnings were justified. Because most of the staff had been hired as consultants, there was little internal structure. Laymon had a hard time figuring out which employees actually worked full-time at the foundation and what, exactly, anyone did. Renee Burchard, who was hired in April 2020 as the chief administrative officer, says there was a kind of start-up atmosphere in the early days — a scrappiness, not to mention an awareness of the enormity of the task before them. The issue, she says: "We never got to the point where we weren't acting just like a crazy start-up."

The longer Laymon and Burchard worked at the foundation, the less sense the organization seemed to make. Simple questions — *Who's in charge?* — led to complicated answers. The foundation had its own CEO, a former professor of management at Ohio State named Tony Rucci, but then there were Dan DiLella and Frank Giordano, who held the top two roles at the federal commission overseeing the foundation and appeared to have final decision-making authority. According to the lawsuit that Burchard and Laymon, along with Keri Potts, vice president of communications, and Kirsti Garlock, the former chief legal officer, would later file against America250, Giordano worked as little as 10 hours a week despite collecting a $165,000 salary as executive director. He would allegedly sleep through meetings. Once, he Zoomed into a call in the middle of a croquet game, wearing his all-whites. (In addition to his work at the commission, Giordano is still the CEO at his family trucking business and president of the nonprofit Philly POPs, where he used to draw a six-figure salary but has been working pro bono since July 2020.) According to a commission spokesperson, Giordano often works more than 40 hours a week for the commission and vehemently denies ever sleeping through meetings. The time he took a call in croquet gear, he interrupted his vacation to do so, according to the spokesperson.

As time went on, the four employees began to notice that a number of - America250's contracts went to groups with personal ties to DiLella and Giordano. The foundation had been paying $40,000 a month to a Philly public relations firm called Maven Communications, which did PR for DiLella's real estate company, Equus. At the time, America250 had only a couple thousand followers on social media and was receiving little press coverage. "It was outrageous," says Potts, who previously worked doing PR for large companies like ESPN. (According to a foundation finance report from December, Maven has been paid more than $600,000 to date.) There was the foundation's

Case ID: 230102023

general counsel, Tom McGarrigle, a friend of Giordano and DiLella who serves on the Union League board. He worked pro bono, but his law firm, Reed Smith, later began billing the foundation for other lawyers' time. There was a similar arrangement with the commission's general counsel, Joseph Del Raso, who serves as chairman of the Philly POPs board. According to the suit, when Rucci tried to end the contract with Reed Smith, DiLella and Giordano stepped in to reinstate it. DiLella also hired the daughter of an Equus executive to work for him as a "director of operations and communications" — "a job without any clear duties," Laymon says — at a six-figure salary, according to multiple sources.

DiLella says that in the early days of the foundation, there was "no money, no structure, no input and no help." It was his job to staff up the foundation, and with his supply of prospective employees limited to those who were willing to work for free, he says, he had to rely on consultants — namely, "friends who owed me something." (Many of them worked pro bono for at least a year.) "This was no cronyism," he says. "What I did is, I called on the people of Philadelphia." Including himself: He says he donated $250,000 of his own money to jump-start the process.



Anna Laymon, right, and Renee Burchard, center, with attorney Pam Keith in Washington, D.C., in April / Photograph by Bill O'Leary/The *Washington Post* via Getty Images

The challenges weren't lost on Laymon. "Dan is trying to stand this organization up; they aren't given any federal funds in the beginning, so they really do have to kind of call upon friends and family," she says. The issue was that when Laymon came on board, it was 2021 — two years later. The Congressional appropriation spigot had turned on, and the contracts had since been converted from pro bono to paid, which she felt could no longer be justified. When the four women employees tried to point this out, they claim, they were stonewalled, which led them to a different conclusion — the one laid out in their lawsuit: "These contracts were benefits given to friends of Mr. DiLella and other senior leaders that circumvented the open RFP process, and were treated as sacrosanct, no matter how absurd they were."

There were other baffling decisions, among them the foundation's choice, first reported by the *Wall Street Journal*, to enter into a $10 million deal with Facebook as its first corporate sponsor. Aside from the obvious irony — America250 partnering with a corporation that's one of the biggest threats to the celebration of an America300 down the line — Burchard says the arrangement was completely at odds with America250's sponsorship strategy, which had been to create a series of thematic programming "platforms," each with its own series of events, that individual companies could exclusively sponsor. The Facebook contract didn't adhere to the thematic groupings; it promised the company sponsorship rights across all of America250's events. Burchard says she raised concerns to leadership only to learn that the contract had already been signed, without notification to her or any of the other female executives on staff. (A foundation spokesperson says that "everyone's perspectives and concerns are acknowledged and respected" but that none of the four plaintiffs were "in a position to make an ultimate decision on corporate sponsorships." In June, Facebook backed out of the deal entirely, with an anonymous source in the *Wall Street Journal* citing concerns over "leadership dysfunction.") According to Burchard, this was typical of how decisions were made — day-to-day employees came up with plans, only to see them disregarded by higher powers who happened to be a group of men, most of whom were friends and had ties to the Union League. "It was kind of like the wizard behind the curtain," she says. Laymon says the situation amounted to a "big cabal of men, passing down their dictates."

The all-male leadership team also led, according to the lawsuit, to a workplace that was sexist and "toxic." When America250 began a search in 2021 to replace Tony Rucci, who had resigned as CEO, there were no women on the search committee, and none of the five finalists were women, according to the

lawsuit. When Joe Daniels, previously the CEO of the 9/11 Memorial in New York City, was finally hired as Rucci's replacement, Burchard claims, he asked her to change her duties to effectively act as his secretary, taking notes at meetings and managing his calendar. "He said to me that I need to learn how to serve him," Burchard says. "I don't think he said that to the other males that were on the leadership council." (Daniels declined to address that specific allegation, citing the ongoing lawsuit, but said, "I've treated everyone on staff in a way that I would hope my children's future bosses would treat them.") Potts, who has spoken openly about surviving a sexual assault in Italy in 2008, alleges in the lawsuit that a member of the America250 staff once disparaged her in a "drunken sexist tirade," telling a colleague he doubted she'd ever been a victim of sexual assault. She says she was discouraged by her male supervisor from making a formal report of his behavior.

By December 2021, the four women — the only female executives to have worked at the foundation to that point — had all resigned. Laymon had had six people directly reporting to her: four women and two men. It felt like a confirmation of her decision when, after she left, the foundation promoted two men to replace her — and, according to a 2022 budget, paid one of them $25,000 more than she'd ever made in the role.

•

**MEANWHILE, PRESSURE WAS** building from inside the commission. In November 2019, it had approved bylaws stating that it would vote on all annual budgets and contracts, but in the two and a half years since, no such votes had been taken. Hohns grew even more concerned when he saw the allegations of contract malfeasance laid out in the lawsuit, which seemed to prove the importance of monitoring budgets. "The chairman is not the supreme lord and all of his vassals, you know, if they're favored, maybe get a little fiefdom," Hohns says. "That's not how it's supposed to work."

"The whole thing has basically been a sham," says fellow commissioner Noah Griffin, who has worked in politics for decades and was appointed by Nancy Pelosi. Last September, Griffin, Hohns, and James Swanson, a *New York Times* best-selling nonfiction author — decided to interrupt a commission meeting to air their concerns, planning to call for an independent audit into the foundation's finances and a Congressional investigation. Once the trio had finished reading their prepared remarks and it was time to debate the proposal, though, DiLella responded with a kind of one-man anti-filibuster: the mute button. Neither Hohns nor Swanson got to speak any further. "Dan just shuts everybody down," Griffin says. "It's not his commission; it's the

country's. He's running it like Trump tried to run the damn government." For his part, DiLella says he muted the commissioners because they'd chosen to interrupt the meeting instead of waiting for their turn on the agenda. "I have refused to have a shouting match with these people," he says. "They have been making personal attacks on commissioners, and me, and the commission. They've been at it now for years. … I don't know what it is they want." (An internal report later confirmed that the commission had failed to vote on budgetary items but suggested these procedures were "guidelines rather than rigid rules." The report was performed by the law firm Troutman Pepper, one of whose partners is Del Raso, the commission's general counsel, who serves with DiLella and Giordano on the board of the Philly POPs.)

At the next meeting, in March 2022, DiLella took a different tack. He proposed new bylaws, striking the entire section titled "issues requiring votes by the Commission." If the change was approved, apparently nothing would require votes by the commission anymore. DiLella also proposed rules strengthening his control over meetings, including a provision declaring, "Commissioners should refrain from speaking until recognized by the Chairperson." DiLella also planned to vote on a not-especially-democratic-sounding item that would have approved all past actions of the America250 Foundation that hadn't yet been voted on. (He eventually scrapped that part.)

This time, the meeting, held on Zoom, proceeded entirely on mute and without debate. Hohns calls this "a direct attack on the First Amendment of the Constitution of the United States." Bob Brady sat at a long table flanked by the U.S. and Philadelphia flags; David Cohen sat flanked by Canadian and U.S. flags. Hohns sat before a bookcase, his hair slicked back, looking displeased. Congressman Robert Aderholt, a Republican from Alabama, held a sign reading, "I would like to be heard." Congresswoman Bonnie Watson Coleman, a Democrat from New Jersey, held a sign reading, "I demand to be heard." The signs did no good. In the end, the commission approved the new rules, 12 votes to 10, with Brady and Cohen among those voting in favor. (Neither commented for this story.)

At its core, the fight has boiled down to a fundamental disagreement on the roles of the commission and the foundation. DiLella sees the commission as a "board of directors. We basically set the strategy." He contends it's been impossible to rely on the commissioners, unpaid volunteers who have other important responsibilities, like being senators and such, for everyday decision-making; hence the need for the foundation. "In three and a half years, we've had three quorums," DiLella says. The bylaw changes weren't a power grab, he insists, but a streamlining — subcommittees still take votes on matters of

importance, which he says are then brought to the whole commission. Pat Toomey, who tapped DiLella for the commission, says he thinks the body is "functioning extremely well" and that the critiques amount to "agitation by a very small number of malcontents that have been very difficult to work with."

Laymon and Hohns see it differently. "The outcome of that governance structure is that there is absolutely no oversight of how any federal funds are being spent," Laymon says. "It functionally allowed them to slide federal funds to a private organization that can slide those funds out." Hohns claims DiLella is running the commission like it's his personal business. "I think it's *our* business," Hohns says, "as in the people's business."

•

**THERE IS, BELIEVE** it or not, actual planning taking place for the Semiquincentennial. The foundation created an America250 Award that it gave out at halftime of an NFL game on Thanksgiving, and there have been talks about sponsoring a college football bowl game and creating an -America250-themed cooking show. Daniels, the new CEO, says there's more substantive programming — not just branding — in the works, too. The foundation partnered with Carpenters' Hall in Old City to create a "young person's Congress" in 2024 that will serve as a kind of Semiquincentennial kickoff, bringing high-schoolers from all 50 states to Philadelphia to discuss civics and democracy.

The main event, a National Semiquincentennial Convention, will take place over multiple days two years later in Philly. "We're talking about an unprecedented mix of a cultural festival, political convention, a whole series of civic engagements in an Olympic Village-style plan," Daniels says. He imagines an exhibition for all 50 states, just like during the Centennial 150 years ago, where the next generation can continue to learn what's up with Mississippi and Nevada. There will be concerts, film screenings, art exhibitions, an actual political convention where state delegations — everyone from the President to regular people — will come together to debate the issues of the day. "We want to show how dialogue can happen in a serious way," Daniels says. Who knows? Maybe they'll even come to blows, just like Congressmen Roger Griswold and Matthew Lyon did inside Independence Hall in 1798, beating each other with a cane and metal tongs.

In true decentralized American fashion, other planning efforts are under way at the state and local levels. There's America250PA, an official America250 offshoot that has a full-time staff of four and whose programs include planting

trees in all 67 counties and commissioning local artists to paint bells across the Commonwealth in 2026. At the local level, there's Philadelphia250, the rechristened version of Hohns's original USA250. Gone are the lucrative sponsorship agreements with Fortune 500 companies, which were contingent on USA250 actually planning the celebration. These days, Philadelphia250's ambitions, like those of America250PA, are more circumscribed. The nonprofit is soliciting proposals for community-sourced legacy projects — things like repairing rowhouses or creating what executive director Danielle DiLeo Kim calls "more accessible, democratic public space" in parks — that will last beyond 2026. "That is a completely new approach to legacy-building," DiLeo Kim says, "which is to go to the people and say, 'What do you think Philadelphia needs to leave behind?'" You can hear an echo of Hohns in that. The Kenney administration has named Philadelphia250 the official planner for the city celebration, though it's due to receive just $250,000 from the government this year.

If some of this sounds a bit inchoate — well, it's still early. Remember: The great Centennial fairgrounds were built in just a few years. But that was then; this is now. Hohns remains concerned about the lack of progress. "We haven't yet gotten to the point where we're even entertaining the idea of what the major public investment could be," he says. "It's not about competing visions of what the public investment should be. This is more like a baseline question: Should there be a large public investment in connection with the 250th anniversary?" His answer, as ever, is yes.

Nor is Burchard holding her breath for an earth-shattering celebration by the time 2026 rolls around. Absent leadership changes at the commission, she says, "I do not see any way that this is going to be what the vision was in the beginning." The dysfunction at the commission, however, has caught the attention of at least a few elected officials. House members Bonnie Watson Coleman and Dwight Evans and Senator Bob Casey, who all serve on the commission themselves, wrote to DiLella in February, expressing concern about the allegations of workplace discrimination and potential misuse of federal funds. (The commission had spent $11 million through 2021 and budgeted another $8 million for this year.) DiLella also announced an independent investigation into the discrimination allegations, though the four women have declined to participate, claiming that the law firm hired by the commission — which states on its website that it has "represented management exclusively" and has experience "defending against wrongful discharge and discrimination claims" — can't possibly be impartial.

Case ID: 230102023

For now, though, the status quo reigns — sort of. Daniels, at least, is saying the right things about cleaning up the foundation and repairing the wounds inside the commission. "If the commission can't get along, how can we possibly ask the country to come together?" he says. He acknowledges that the commission "should be more diverse than it currently is" and says six of his first eight hires at the foundation have been women. (The five highest-paid employees are all men, according to a 2022 budget and a source familiar with internal foundation salaries.) He claims the days of friendly contracts at the foundation are over. According to a foundation spokesperson, Maven Communications, for instance, is no longer its communications firm. But it remains unclear how much has changed. Daniels, after all, was accused in the lawsuit of contributing to the sexist work environment at America250 — "There would be no lawsuit against them without Joe Daniels," says Burchard — and DiLella and Giordano remain the two most powerful commissioners.

Not everyone believes change is necessary, either. If the fight over America250 is between the DiLella-Giordano vision and the Hohns vision, Philip Auerswald, a professor of public policy at George Mason University who co-chairs one of America250's many advisory councils, sits firmly in the former camp. Like Hohns, he had formed a nonprofit years ago to begin planning for the Semiquincentennial. Naturally, he decided he needed to meet this Andrew Hohns who was doing similar work in Philly. "His intentions were extremely Philadelphia-centric and also worryingly self-serving," Auerswald says. "He literally pointed to a plot of land outside of his office that he envisioned as being Semiquincentennial Park. And he had an array of Philadelphia development activities that he felt could be set into motion by the planning of America's 250th." (Hohns says he doesn't invest in Philadelphia real estate and that at any rate, the land he was pointing out — the rail yards around 30th Street Station — is federal property. "I guess I had a personal motivation in the sense that my office had a view of that area," he says.)

Auerswald has a series of simple explanations for the controversy enveloping America250. First: jealousy on Hohns's part that USA250 was passed over as the Semiquincentennial's nonprofit partner. Second: "This is like puny on-campus infighting, except that it's puny Philadelphia society infighting, and it's an embarrassment to Philadelphia." He goes on, "There's a difference between making the best you can out of the reality of your relationships" — as he believes DiLella and Giordano have — "and consciously using a national activity for self-serving objectives. And it is deeply, deeply disappointing that at this very early stage, an individual or a group of individuals with the latter set of goals has been so influential in undermining this fragile start."

Case ID: 230102023

There are very few things Hohns and DiLella seem to agree on, but the assessment that a group of individuals with "self-serving objectives" has undermined the celebration might be one of them. The issue is that both think it applies to the other. Then again, maybe it's fitting. You could think of the Semiquincentennial celebration as a way of holding up a mirror — to see the country's reflection, yes, but also to see everything that's behind us, and to spend some time thinking about the background and foreground coming together to meet in the present. Two divided sides, two diametrically opposed versions of reality, acrimony all around ... as the United States approaches its 250th year, what could possibly be more American than that?

*Published as "The Battle for America's Birthday" in the July 2022 issue of* Philadelphia *magazine.*

Case ID: 230102023